UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

JOAN ELIZABETH TOYER *et al.*,

Plaintiff,

v.

MONSANTO COMPANY,

Defendant.

NO. 3:19-cv-05803-BHS

**DEFENDANT MONSANTO COMPANY'S MOTION TO EXCLUDE TESTIMONY OF JASON MACLEAN, PH.D.**

Noted for Consideration: 11/23/26

ORAL ARGUMENT REQUESTED

## INTRODUCTION

Plaintiff seeks to offer Jason MacLean, Ph.D. to opine that Monsanto violated FIFRA and captured EPA's Office of Pesticide Programs, along with all international regulatory agencies whose risk assessments find glyphosate-based herbicides do not pose a real-world cancer risk. Ex. A, MacLean Rpt. at 281–84. MacLean's opinions, if they belong anywhere, are legal arguments for Plaintiffs' closing. The gate should be closed to his inadmissible and prejudicial testimony. Fed. R. Evid. 702, 403. Prior Roundup courts have agreed. Ex. B, *Alison* Order at 26-31; Ex. C, *Peters* Order. For the following reasons, this Court should exclude his opinions in full.

///



SHOOK, HARDY & BACON L.L.P.
701 Fifth Avenue, Suite 6800
Seattle, WA 98104-7066
Tel.: 206-344-7600

## LEGAL STANDARD

Expert testimony is admissible only if the proponent demonstrates that, more likely than not, the testimony will assist the trier of fact, rests on sufficient facts or data, results from reliable principles and methods, and reflects a reliable application of those principles and methods to the case. Fed. R. Evid. 702. The Court must ensure that expert testimony is relevant and reliable, rather than subjective belief or unsupported speculation. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589–90 (1993); *Greenawalt v. Sun City W. Fire Dist.*, 23 Fed. Appx. 650 (9th Cir. 2001).
An expert must employ the same intellectual rigor in the courtroom that characterizes practice in the relevant field. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). They must also be qualified on the particular topic of his testimony. *Jinro Am. Inc. v. Secure Invs., Inc.*, 266 F.3d 993, 1005 (9th Cir.), opinion amended on denial of reh'g, 272 F.3d 1289 (9th Cir. 2001). Notably, "the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology" are *not* "questions of weight" for the jury. *Id.* "The district court cannot abdicate its role as gatekeeper nor delegate that role to the jury." *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1050 (9th Cir. 2025). Nor is there a presumption of admissibility; "a proponent of expert testimony must always establish the admissibility requirements of Rule 702 by a preponderance of the evidence." *Id.*

## ARGUMENT

### I. MacLean Is Not Qualified To Offer His Opinions.

Despite what he claims, MacLean is not a "practicing lawyer, legal consultant, [or] legal academic[.]" Ex. D, *Hayden* Dep. at 33:5–12. He earned a law degree in 2006, began his career as a law professor in 2013, and in 2021, earned a doctorate in law from a Canadian university. *Id.* at 9. Ex. E, 6/12/23 *Peters* Dep. at 52:19–53:21. As of April 2025, MacLean was not licensed to practice law anywhere. Ex. F, 4/30/25 *Sander II* Dep. at 21:3-8. He became an LLM candidate at the University of Chicago Law School after "batting zero" offers after submitting "a couple dozen" applications for paid academic jobs. Ex. D, *Hayden* Dep. at 39:23–40:2; 44:17–45:24; 51:11–14;



SHOOK, HARDY & BACON L.L.P.
701 Fifth Avenue, Suite 6800
Seattle, WA 98104-7066
Tel.: 206-344-7600

52:7-24; 55:11–16; 56:25–57:9. Nevertheless, he claims to be "leading scholar" on climate-change policy and regulatory capture in Canada because an anonymous journalist told him an anonymous academic referred to him as such. Ex. A, MacLean Rpt. at 9 n.1. He currently describes himself as "a lawyer and legal scholar focused on AI."[1]

Before his expert retention in 2022,[2] MacLean had never spoken publicly about Monsanto participating in regulatory capture. Ex. G, *Evard* Dep. at 7:21–23; Ex. D, *Hayden* Dep. 50:23–51:2. He has never published on glyphosate or Roundup in a peer-reviewed journal, let alone about regulatory capture concerning those products. Ex. D, *Hayden* Dep. 35:5–16. MacLean's research prior to being retained for this litigation was focused on environmental law and natural resources law. *See* Ex. A, MacLean Rpt. at 10-11.

MacLean is also not qualified to testify about scientific studies and agreed not to do so. Ex. D, *Hayden* Dep. at 7:23–8:9. Given this concession, he should be precluded from opining that glyphosate or Roundup are harmful. *See e.g.* Ex. H, *Evard* Tr. I at 6162:1–6163:23, 6167:24–6168:3, 6174:7–17. Further, an expert may only assume glyphosate is harmful if they rely on "admissible general causation opinions of any other experts in this litigation." Ex. I, *Beckfield* Order at 2 (excluding Dr. Vogel, a specific causation expert who did not rely on a general causation expert to rule in Roundup); *Dura Auto. Sys. Of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 612–14 (7th Cir. 2002) (affirming exclusion of expert offering opinions of undisclosed others). MacLean's report discloses that he relies only on the expert report of Dr. Irving Allen, prepared in a different Roundup case. Ex. A, *MacLean* Rpt. at 13 n.13. Dr. Allen was not disclosed here. *See* Ex. J, Plaintiffs' Notice of Service of Expert Disclosure.[3] Like Dr. Vogel, MacLean's opinions should be excluded on this

---

[1] Jason MacLean, Substack, https://substack.com/@jasonmaclean2 (last visited Oct. 27, 2026); Jason MacLean, LinkedIn, https://www.linkedin.com/in/jason-maclean-67445013 (identifying "Law and AI Research" experience at University of Chicago Law School) (last visited Oct. 27, 2026).

[2] Since then, he has tried to use his work for Roundup plaintiff lawyers to seek employment at dozens of U.S. law schools. Ex. K, 7/29/24 MDL Dep. at 51–52.

[3] Plaintiffs attempt to "incorporate by reference the general causation and other experts' reports served by lead counsel in connection with Wave[s 1–8] and reserve the right to call the author of any such report as an expert witness at trial." *Id.* at 1. While Rule 703 permits an expert to rely on information supplied by another, it does not permit Plaintiffs to sidestep this requirement by referring generally to the dozens of experts who have been disclosed throughout ten years of litigation.



SHOOK, HARDY & BACON L.L.P.
701 Fifth Avenue, Suite 6800
Seattle, WA 98104-7066
Tel.: 206-344-7600

basis. Moreover, Dr. Allen does not even address many of the scientific claims in MacLean's report.[4] *E.g.*, *id.* at 146–48 (discussing ATSDR's toxicological profile of glyphosate); *id.* at 172–77 & 222–224 ("The scientific inadequacy of EPA's reclassification of glyphosate and GBH products including Monsanto's Roundup is demonstrated by Dr. Christopher Portier's recent reanalysis…" which is cited but not discussed by Dr. Allen); *id.* at 197–209 (arguing Roundup's inert ingredients are harmful, which Dr. Allen does not address).

MacLean characterizes studies commissioned by pesticide manufacturers as necessarily and categorically conflicted, treats EPA's reliance on them as inconsistent with the best available science, and concludes that foreign regulators improperly discount that science. Ex. A, MacLean Rpt. at 127–28, 284. MacLean's purported policy scholarship is not a reliable basis for those scientific judgments, and without admissible general causation testimony to rely on, his opinion is unreliable and inadmissible. The Court should exclude it.

**II. MacLean's Opinions Impermissibly Rely on Narrating Monsanto or EPA Documents and Speculating About Monsanto's or EPA's Motives or Intent.**

MacLean will urge the jury to infer—from statements in documents—that regulators' findings about glyphosate are corrupt and Monsanto is a bad actor. Ex. L, *Kay* Dep. at 133:21–134:6 ("That's what I do in my analysis: I draw inferences from explicit documentary evidence."). But the jury can draw those inferences on its own, and MacLean has no special expertise regarding Monsanto or pesticide regulators that would assist them. *See Oracle Am. Inc., et al. v. Hewlett Packard Enter. Co.*, 2018 WL 6511146, at *3 (N.D. Cal. Dec. 11, 2018) (holding that opinions about an organization's intent are unhelpful); *United States v. Rahman*, 189 F.3d 88, 136 (2d Cir. 1999) ("defendant's experts were not competent to testify to [defendant's] intentions or beliefs."); *DePaepe v. Gen. Motors Corp.*, 141 F.3d 715, 720 (7th Cir. 1998) (reversing admission of engineer's testimony that GM reduced sun visor padding "to save money" because expert had not participated in design deliberations). "'Courts routinely exclude as impermissible expert testimony as to intent,

[4] The same defect applies to expert materials from the state-court Roundup trials cited in his report. Ex. A, MacLean Rpt. at 12, n.13.



SHOOK, HARDY & BACON L.L.P.
701 Fifth Avenue, Suite 6800
Seattle, WA 98104-7066
Tel.: 206-344-7600

motive, or state of mind,' which often 'offers no more than the drawing of an inference from the facts of the case.'" *Woods v. City of Hayward*, 2021 WL 4061657, at *17 (N.D. Cal. Sept. 7, 2021) *quoting Siring v. Oregon State Bd. of Higher Educ. ex rel. E. Oregon Univ.*, 927 F. Supp. 2d 1069, 1077 (D. Or. 2013) (collecting cases); *see also* Ex. C, *Peters* Order at 3 (excluding MacLean's intent opinions as unhelpful and invading the jury's province).

MacLean admits his regulatory capture methodology relies on determining Monsanto's intent.[5] *See* Ex. M, *Brazell* Dep. at 57:14–25; *see also* Carpenter at 14 ("Both intent and action on the part of the regulated industry are required."). His opinion relies entirely on documents. *See, e.g.*, Ex. L, *Kay* Dep. at 133:21–134:6. He did not speak to any EPA or Monsanto employees before forming his opinions. Ex. D, *Hayden* Dep. at 26:25–27:22; Ex. H, *Evard* Tr. I at 6175:6–8; Ex. N, *Evard* Tr. II at 6224:11–14. More recently he claimed he only will opine on Monsanto's intent "where the documents themselves make that intention unequivocally clear." Ex. L, *Kay* Dep. at 135:14–17. If that is true, his opinions are unhelpful.

In lieu of applying any reliable methodology for interpreting Monsanto or regulators' documents, he simply ascribes to Monsanto the least-charitable interpretation. Take, for example, his treatment of Monsanto's response to the IBT fraud scandal. Ex. A, MacLean Rpt. at 29–35. FDA began investigating IBT in 1976, at a time when IBT was the largest contract laboratory in the United States responsible for around 35–40% of all toxicology tests nationwide, including 60 long-term studies for Monsanto. In March 1977, FDA officials publicly called IBT data into question during testimony before the Senate Subcommittee on Health and Scientific Research. A July 1977 internal Monsanto memorandum recommended Monsanto consider legal action against IBT, noting "many factors must enter into this consideration." *Id.* at 34–35. MacLean speculates that "Monsanto's primary concerns appear to have been the time and cost associated with auditing and revalidating

[5] Because MacLean's intent opinions are the keystone upon which all of his regulatory capture opinions rest, his entire opinion should be inadmissible if opinions as to company intent are inadmissible. "Under *Daubert*, 'any step that renders the analysis unreliable…renders the expert's testimony inadmissible. This is true whether the step completely changes a reliable methodology or merely misapplies that methodology.'" *Mitchell v. Gencorp Inc.*, 165 F.3d 778 (10th Cir. 1999) *quoting In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 745 (3d Cir.1994).


SHOOK, HARDY & BACON L.L.P.
701 Fifth Avenue, Suite 6800
Seattle, WA 98104-7066
Tel.: 206-344-7600

studies," ominously stating, "[t]here is no mention whatsoever of possible public health or environmental safety risks." *Id.* at 35. Not only is MacLean's inference pure speculation—there is no reason to expect an internal litigation strategy memorandum to discuss possible public health and environmental safety risks—it is untethered to anything resembling a reliable methodology.

MacLean also infers capture from supposedly "frequent" interactions between Monsanto and regulators. Again, this is unreliable speculation. He has never participated in Monsanto's interactions with regulators, never spoken with Monsanto or regulatory employees about these interactions, and admits there is nothing nefarious about registrants meeting with regulators. Ex. G, *Evard* Dep. at 102:21–103:17; Ex. O, *Berns* Dep. at 184:13–185:6.

Accordingly, MacLean should not be permitted to opine about Monsanto or regulators' motives or intent.[6] *Deutsch*, 768 F. Supp. 2d at 442.

## III. MacLean's Regulatory Capture Analysis And Methodology Are Unreliable.

MacLean's nebulous analysis has no place in a courtroom. He purports to follow the methodology described by David Carpenter and David A. Moss in their book "Preventing Regulatory Capture." *See* Ex. A, MacLean Rpt. at 88 n.343. Professors Carpenter & Moss, however urge far more caution than MacLean exhibits. *See* Carpenter, Introduction *available at* https://tobinproject.org/sites/default/files/assets/ Introduction%20from%20Preventing%20Regulatory%20Capture.pdf. They note, for example, that "policy analysts are often quick to see capture whenever an interest group appears to benefit from regulation, or even when there is merely motive for capture," Carpenter at 20, and "capture is often misdiagnosed, and these misdiagnoses are enabled by a kitbag of weak evidentiary standards that have arisen in economics, history, political science, and sociology for making inferences about capture in regulation," *id*. at 21.

---

[6] MacLean's report discusses several irrelevant and unhelpful topics that should also be excluded under Rule 702: narratives about EPA and Monsanto's relationship and Monsanto's "corporate conduct" unrelated to Roundup, Ex. A, MacLean Rpt. at 211 (discussing non-glyphosate product Dicamba); regulatory capture in the Federal Aviation Administration and the U.S. civil aeronautics industry, *id*. at 98; Ex. G, *Evard* Dep. at 92:1–21; and Monsanto's relationship with EPA with respect to superfund site designations, Ex. A, MacLean Rpt. at 84 n.324, Ex. G, *Evard* Dep. at 78:3–81:17.


SHOOK, HARDY & BACON L.L.P.
701 Fifth Avenue, Suite 6800
Seattle, WA 98104-7066
Tel.: 206-344-7600

Indeed, MacLean does precisely what Carpenter warns about. But MacLean's misdiagnosis is not an accident—his opinions were formed for this litigation. *See* Ex. D, *Hayden* Dep. at 50:23–51:2. It is no wonder that each of his opinions fail each of the non-exhaustive factors identified in *Daubert*. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 593 (1993) (identifying factors). His regulatory capture analysis cannot be tested, and his specific method for identifying regulatory capture is not generally accepted by the community of people who study regulatory capture.[7] He has not subjected any opinions on glyphosate or Roundup to publication or peer review. Ex. D, *Hayden* Dep. at 35:5-16. He does not provide a frame of reference with which to compare Monsanto's alleged conduct that he considers proof of exerting influence. Nor does he consider counterfactuals (i.e., what EPA would have done if not for Monsanto's alleged efforts to influence it). *See, e.g.*, Ex. D, *Hayden* Dep. at 70:21–71:3 (he does not opine that any regulatory agency would have found glyphosate carcinogenic but-for regulatory capture, admitting he has not "examined the issue that way").

**A. MacLean's Purported Methodology.**

MacLean defines regulatory capture as "the result or process by which regulation, in law or application, is consistently or repeatedly directed away from the public interest and toward the interests of the regulated industry, by the intent and action of the industry itself." Ex. A, MacLean Rpt. at 83 (citing Carpenter & Moss, Preventing Regulatory Capture, Cambridge University (2013) ("Carpenter")). Under MacLean's theory, only members of the pesticide industry may capture EPA's Office of Pesticide Programs ("OPP"). Ex. D, *Hayden* Dep. at 10:1–11:8. He recognizes only varying degrees of capture, not legitimate industry participation. Ex. A, MacLean Rpt. at 88 n.343 & 89.

MacLean uses three prongs to identify regulatory capture: (1) the public interest at stake; (2) an observable policy or regulatory shift away from the public interest and toward industry (special)

[7] No regulatory agency in the world—including the EPA's Office of Inspector General, who provides independent oversight of EPA—has ever concluded that Monsanto has engaged in regulatory capture. Ex. D, *Hayden* Dep. 17:18–18:4 (same).



SHOOK, HARDY & BACON L.L.P.
701 Fifth Avenue, Suite 6800
Seattle, WA 98104-7066
Tel.: 206-344-7600

interest; and (3) action and intent by an industry or firm (special interest) in pursuit of this policy or regulatory shift capable of materially contributing to the shift, in whole or in part. Ex. A, MacLean Rpt. at 88. Under the third prong, MacLean argues: "Monsanto exerts undue influence over EPA's OPP for the benefit and the profit of Monsanto." *Id.* at 83. His analysis consists of cobbling together what he considers "the six most common indicators of regulatory capture": (1) large economic incentives for industry to pursue capture (concentrated costs), (2) agency dependency on industry to understand complex issues (complexity), (3) heavy socio-economic and cultural overlap between regulators and industry employees (or "coziness") (4) strategic industry complaining (or "squawking"), (5) inadequate agency budgets, and (6) regulatory inaction. *See* Ex. A, MacLean Rpt. at 90–107. Even assuming *arguendo* MacLean's methodology could withstand scrutiny, his application of that methodology is unreliable, and his resulting opinions are inadmissible.

**a. MacLean fails to offer a defeasible model of the public interest.**

According to Carpenter & Moss, the first part of any regulatory capture argument must "[p]rovide a defeasible model of the public interest." Ex. A, MacLean Rpt. at 88 n.343. They explain: "Measuring the public interest is a thorny problem as old as democracy itself…in lieu of an ability to directly perceive and measure the public interest, we must build defeasible models of the public interest for purposes of assessing whether a particular regulation is captured." Carpenter at 13–14. A defeasible model must "be capable of being shown to be false (tautological or vacuous definitions are unacceptable)." *Id.* MacLean's model of the public interest—"to protect the public from, among other things, harmful pesticides"—is not defeasible. Ex. A, MacLean Rpt. at 108. It is entirely subjective. *See* Ex. M, *Brazell* Dep. at 89:4–90:25 ("The key thing…[is] to determine a clear…public interest at stake…one we can agree upon. So, you know, I can put it forward. You can look at what I've done. Disagree with me. People can decide who's right, who's wrong."). MacLean does not even satisfy the first theoretical requirement of his purported methodology.

In the second step, MacLean must identify an "an observable policy or regulatory shift away from the public interest and toward industry (special) interest." Ex. A, MacLean Rpt. at 88. He



SHOOK, HARDY & BACON L.L.P.
701 Fifth Avenue, Suite 6800
Seattle, WA 98104-7066
Tel.: 206-344-7600

opines the second prong is met because "EPA has, as early as 1991, shifted away from exercising its authority to regulate glyphosate and GBH products including Monsanto's Roundup by making decisions in a manner that relies on the best-available science on a weight-of-evidence approach." Ex. A, MacLean Rpt. at 109. In 1991, when Monsanto was the sole registrant for glyphosate-based herbicides, EPA formally categorized glyphosate as unlikely to be carcinogenic. MacLean assumes EPA is incorrect, and that assumption is the basis for all of his other opinions. *See* Ex. A, MacLean Rpt. at 172, 175–76, 187, 275–77. That renders his regulatory capture analysis unhelpful; because he assumes EPA is incorrect, his analysis cannot make that fact more or less likely. In any event, "[i]f Monsanto's actions with regard to the [EPA] or other regulatory agency are relevant to any issue in this case, that must be presented in evidence and decided by the jury." Ex. C, *Peters* Order at 1-2.

MacLean further opines "EPA has also abdicated its statutory responsibility to evaluate, in an independent and robust manner, the toxicity of chemicals before allowing them to come onto the market and be used widely in the environment." *Id.* at 109. He relies on his subjective belief that, since glyphosate's initial registration in 1974, Monsanto violated FIFRA. *See id.* at 29–83; Ex. M, *Brazell* Dep. at 122:4–123:15 ("Q. Sometimes it's simply your own opinion that a law was violated, right? A. Sometimes it is my expert opinion, yes."). No methodology or admissible evidence supports his legal conclusions. *See infra* Section IV.

**b. MacLean's opinions on Monsanto's actions and intent are unreliable.**

MacLean identifies six "indicators of regulatory capture" that he cobbled together from separate sources and have not been published as a coherent set in any peer-reviewed publication. Ex. N, *Evard* Tr. II at 6201:9–12. This is not a "scientific method, as it is practiced by (at least) a recognized minority of scientists in their field." *Daubert*, 43 F.3d at 1319. And his application of those indicators is unreliable.

MacLean's concentrated costs indicator is unhelpful. *See* Carpenter at 16 ("indications that



SHOOK, HARDY & BACON L.L.P.
701 Fifth Avenue, Suite 6800
Seattle, WA 98104-7066
Tel.: 206-344-7600

a regulated industry has a motive to twist regulation in its favor (and against the public interest) is not sufficient under our definition."). Any regulated industry has more at stake than any individual member of the public. MacLean also opines that Monsanto's "freedom to operate tactics," such as to "actively tell our story," are a "recipe for regulatory capture," Ex. A, MacLean Rpt. at 121, despite also being a recipe for legitimate persuasion.

MacLean's complexity indicator ignores that EPA employs toxicologists and epidemiologists capable of understanding the scientific evidence. *Id.* at 126–27. He finds EPA understaffed by comparing the total number of OPP personnel to the number of registered agents, implausibly assuming that EPA devotes equal attention to each agent at any given time, and ignoring facts like EPA's consultation with a Scientific Advisory Panel on glyphosate. *Id.* at 127. Instead, he relies on a purported internal EPA memorandum and a purported letter from a former EPA employee, which cannot be authenticated. *Id.* at 128–133. MacLean is also unqualified to opine that industry-funded studies "squarely violates [EPA's] commitment to basing decisions on the best-available science." *Id.* at 128.

MacLean's "coziness" indicator is also unreliable. He compares Monsanto's interactions with EPA to an "ordinary member of the public" or member of an environment non-profit, *id.* at 137, as opposed to an unsuccessful registrant or other industry firm where there is no evidence of capture. He relies on unrelated evidence. *Id.* at 136 (discussing alachlor); *id.* at 141–42 (discussing the Arkansas Plant Board). He does not identify any person involved in a specific decision on glyphosate who then went to work with Monsanto. He insinuates that Monsanto skirts lobbying rules—an unqualified legal conclusion—where the facts he cites show the opposite. *Id.* at 138–39. And he interprets OPP's attempt to conserve government resources by avoiding duplicative work as an effort to benefit Monsanto. *Id.* at 145–46.

MacLean's "squawking" indicator does not distinguish legitimate communications from "strategic" complaining. He focuses on Monsanto's efforts to avoid EPA classifying glyphosate as a Class C carcinogen, claiming Monsanto's presentation of scientific evidence was a "data bombing"



SHOOK, HARDY & BACON L.L.P.
701 Fifth Avenue, Suite 6800
Seattle, WA 98104-7066
Tel.: 206-344-7600

strategy, with no objective analysis or standard, to delay EPA's Scientific Advisory Committee's meeting. *Id.* at 164; *see also* Ex. D, Hayden Dep. at 77:19–78:21. Even stranger, he then acknowledges that Monsanto's "forceful objections" were unsuccessful and the meeting proceeded as scheduled. Ex. A, MacLean Rpt. at 165.

MacLean's "inadequate budget" indicator lacks any standard and his opinion does not rely on any specific evidence that EPA lacked budgetary resources to analyze glyphosate. *Id.* at 188–190. His "inaction" indicator relies on legal conclusions about FIFRA compliance and assertions about Roundup's inert ingredients that he lacks the qualifications to support. *Id.* at 193–94.

MacLean's opinions about foreign regulators are especially weak. Indeed, even when he cannot find so-called "coziness" or "squawking," he still diagnoses "[p]robable capture." Ex. A, MacLean Rpt. at 271. Regarding South Korea, he admits that diagnosis is "suggestive" and not offered "to a reasonable degree of probability[.]" Ex. D, *Hayden* Dep. 73:4–74:21. For the New Zealand Environmental Protection Authority, MacLean argues the evidence is "highly suggestive," without having read the Authority's most recent glyphosate report. *Id.* at 74:22–76:5. MacLean's "analysis" is nothing more than an attempt to argue from the witness stand based on *ipse dixit* that Monsanto was unduly influencing agencies whose risk assessments plaintiffs dislike, repackaged under the academic label of "regulatory capture." As the *Peters* court put it, "'[r]egulatory capture' is a term of art coined by those who take issue with the actions or inactions of public agencies amid allegations that certain industries subject to regulation have undue control over those agencies." Ex. C, *Peters* Order at 1. But "[t]his case is about whether products manufactured and sold by Defendant caused Plaintiff's alleged injuries." MacLean's opinions fall well short of Rule 702's reliable methodology requirement. *Id.*

MacLean's indicators for finding capture are imprecise and too "context-sensitive" to be reliable. Ex. A, MacLean Rpt. at 89 n.346. When pressed, he retreats to the same mantra: "context." Ex. D, *Hayden* Dep. at 75:7–11 ("It's contextual."); Ex. L, *Kay* Dep. at 140:18–21 ("I can't emphasize that enough because it's such a critical methodological issue central to understanding



SHOOK, HARDY & BACON L.L.P.
701 Fifth Avenue, Suite 6800
Seattle, WA 98104-7066
Tel.: 206-344-7600

regulatory capture research, how context-sensitive it is."); Ex. N, *Evard* Tr. II at 6217:21–24 ("regulatory capture is highly sensitive, and its indicators interrelate and interact with each other in different contexts"); *id.* at 6311:19–21; *id.* at 6229:3–4. Under this mantra, MacLean can move the goalposts and edit any alleged standards for his regulatory capture opinions however he wishes. The Court should prohibit it and exclude his testimony.

## IV. MacLean's opinions depend on his improper legal conclusions that Monsanto violated FIFRA or other applicable laws or regulations.

Substantial portions of MacLean's report consist of legislative history, commentary, and legal conclusions regarding Monsanto's purported violations of FIFRA and EPA regulations. Ex. A, MacLean Rpt. at 14–28; *e.g.*, *id.* at 28 ("It turns out that there is a further and substantial gap between what EPA expressly requires of pesticide manufacturers, including Monsanto, and EPA's enforcement of those requirements."); *id.* at 29–82 (reciting a selective history of glyphosate's registration and MacLean's legal conclusions that Monsanto violated EPA regulations). This testimony is also inadmissible.

Setting aside his dearth of qualifications, "an expert cannot testify to a matter of law amounting to a legal conclusion." *United States v. Tamman*, 782 F.3d 543, 552 (9th Cir. 2015) (affirming exclusion of expert who "provided only a recitation of facts and the legal conclusion that [defendant] acted in conformity with…the law."); *see also Martinez v. Cnty. of Alameda*, 2024 WL 1117952, *1 (N.D. Cal. Mar. 13, 2024) (excluding legal conclusions).

MacLean's opinions are or rely on legal conclusions. *See* Ex. E, *Peters* Dep. at 19:25–20:4, 21:1 ("…the legal dimension is absolutely critical."). He opines that Monsanto fraudulently submitted data to EPA (Ex. A, MacLean Rpt. at 52), violated EPA's disclosure rules (*id.* at 58, 70, and 75), and violated European regulator's disclosure rules (*id.* at 78). He cites as "a useful illustration," the statements of a Roundup plaintiff lawyer who pled guilty and was incarcerated for attempting to extort chemical companies, arguing "[f]elons can run for president in the United States. Yeah, I stand by [that cite]." Ex. D, *Hayden* Dep. at 65:17–66:21. Finally, he



SHOOK, HARDY & BACON L.L.P.
701 Fifth Avenue, Suite 6800
Seattle, WA 98104-7066
Tel.: 206-344-7600

interprets the Ninth Circuit's decision in *National Resource Defense Council v. U.S. EPA*, No. 20-70787 (9th Cir. 2022). Ex. A, MacLean Rpt. at 81–83. These legal conclusions should be excluded. *See, e.g.*, *Tamman*, 782 F.3d at 552; Ex. C, *Peters* Order at 3 (MacLean's proffered testimony "includes questionable legal conclusions, opinions, and inferences").

**CONCLUSION**

For the foregoing reasons, Monsanto requests the Court exclude MacLean's opinions and prohibit his testimony

Date: November 2, 2026

**SHOOK, HARDY & BACON**

By: */s/ Steven Rich*

Steven W. Rich, WSBA #48444
701 Fifth Avenue, Suite 6800
Seattle, WA 98104-7066
Tel: 206-344-7600
Email: srich@shb.com

***Attorney for Defendant Monsanto Company***

**CERTIFICATE OF SERVICE**

I certify, under penalty of perjury under the laws of the State of Washington, that on this date, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF system, which will send notification of such filing to those attorneys of record registered on the CM/ECF system. All parties, if any, shall be served in accordance with the Federal Rules of Civil Procedure.

*/s/ Steven Rich*
Steven Rich



SHOOK, HARDY & BACON L.L.P.
701 Fifth Avenue, Suite 6800
Seattle, WA 98104-7066
Tel.: 206-344-7600